**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 12-cv-02092-MSK

**JEREMY A. AGUIRRE,**

    Plaintiff,

v.

**CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,**

    Defendant.[1]

**OPINION and ORDER**

**THIS MATTER** comes before the Court on Plaintiff Jeremy A. Aguirre's appeal of the Commissioner of Social Security's final decision denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83c. Having considered the pleadings and the record, the Court

**FINDS** and **CONCLUDES** that:

**I.**     **Jurisdiction**

Mr. Aguirre filed a claim for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI. He asserted that his disability began on January 1, 2006. After his claims were initially denied, Mr. Aguirre filed a written request for a

---

[1] At the time Mr. Aguirre filed his appeal, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin is substituted as the Defendant in this action to reflect her designation as Acting Commisioner of Social Security, effective February 14, 2013.

hearing before an Administrative Law Judge ("ALJ"). This request was granted and a hearing was held on March 24, 2011. A written decision (Decision) was issued thereafter.

In the Decision, the ALJ followed the customary five- step analytical process finding that 1) Mr. Aguirre met the insured status requirements of the Social Security Act through June 30, 2008 and had not engaged in substantial gainful activity since January 1, 2006[2]; 2) From December 5, 2008, Mr. Aguirre suffered from several severe impairments: dysthymia; post-traumatic stress disorder ("PTSD"); a developmental learning disability, not otherwise specified; and episodic alcohol abuse; 3) None of these impairments, considered individually or together, met or were equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings"); 4) Mr. Aguirre had the Residual Functional Capacity ("RFC") to perform a full range of work at all exertional levels subject to non-exertional limitations -  Mr. Aguirre could not perform complex tasks (SVP of 2 or less)[3] and he could deal with the general public only occasionally; and 5) Mr. Aguirre was unable to perform his past relevant work but, upon application of the Medical Vocational Guidelines found in 20 C.F.R. Part 404, Subpt. P, App. 2 ("the Grids"), Mr. Aguirre was able to perform jobs that exist in significant numbers in the national economy, including cleaner/housekeeper and construction worker.

The Appeals Council denied Mr. Aguirre's request for review of the Decision, making it the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d

---

[2] The ALJ bifurcated the disability analysis, first addressing Mr. Aguirre's Title II claim for disability insurance benefits. The ALJ found that the medical evidence did not establish that Mr. Aguirre had a medically determinable impairment that could reasonably be expected to produce his symptoms during the relevant time period (January 2006 to June 2008). Mr. Aguirre does not challenge the ALJ's finding with regard to his Title II claim.

[3] SVP, or specific vocational preparation, is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, Appendix C – Components of the Definition Trailer.

1324, 1327 (10th Cir. 2011).  Mr. Aguirre's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

## II.     Issues Presented

Mr. Aguirre raises five challenges to the decision: (1) the ALJ did not follow all the restrictions in Dr. Wanstrath's opinion; (2) the ALJ did not have a proper reason for giving more weight to Dr. Wanstrath's opinion than he gave to Dr. Madsen's opinion; (3) the ALJ failed to properly assess the credibility of Mr. Aguirre's testimony; (4) the record is not sufficient to properly review the credibility of Mr. Aguirre's testimony; and (5) the ALJ failed to utilize the services of a vocational expert.  The first two issues concern assessment of medical opinions in formulation of Mr. Aguirre's RFC at Step 4.  The third and fourth issues concern assessment of Mr. Aguirre's subjective symptoms in formulation of Mr. Aguirre's RFC at Step 4.  Finding reversible error in both assessments, there is no need to address the final issue.

## III.    Material Facts

The material facts are as follows.  Mr. Aguirre was born on October 19, 1980, and has a high school education.  He has a history of foster care, periodic incarceration and has suffered several serious injuries due to assault, including two broken jaws.  He worked as a forklift driver, drywall installer and at a dairy.  According to his disability application and testimony, he suffers from depression, anxiety, PTSD and bipolar disorder.  Mr. Aguirre stated that his symptoms include panic attacks, a racing heart, painful flashes of light, fear of people and social interaction, insomnia, paranoia, fatigue, crying spells and difficulty concentrating.

There are few medical treatment records documenting Mr. Aguirre's mental impairments prior to May 2010. However, the record contains two medical opinions issued in 2009 that describe Mr. Aguirre's functional limitations.

The first is from Dr. Madsen, a consulting psychologist who examined Mr. Aguirre in March of 2009. Based on his examination and a review of the medical records, Dr. Madsen diagnosed Mr. Aguirre with dysthymia or depression, PTSD, alcohol abuse, impaired intellectual functioning and a developmental learning disability. According to Dr. Madsen, Mr. Aguirre's impairments caused sleep disturbance, decreased energy and motivation, as well as a marked impairment in the ability to do work-related activities. Dr. Madsen concluded that Mr. Aguirre would have difficulties focusing, concentrating and staying motivated such that he would have trouble maintaining regular employment.

The second opinion is from Dr. Wanstrath, a psychologist employed by the State of Colorado to evaluate disability claims. Dr. Wanstrath completed two forms dated April 16, 2009: a Psychiatric Review Technique and a Mental RFC Assessment. He did not examine Mr. Aguirre, but based his opinions on a review of Mr. Aguirre's medical record and Dr. Madsen's examination and report. Dr. Wanstrath wrote that the medical records he reviewed did not mention mental illness, treatment for mental illness, or prescriptions for medication related to mental illness. He concluded that Mr. Aguirre had chronic but moderate symptoms, including isolation, learning problems, and interpersonal conflict, that were not severe enough to preclude work. He wrote that Mr. Aguirre had the mental ability to perform work that was not significantly complex and did not require more than three months to learn. He also wrote that Mr. Aguirre was unable to work closely with supervisors, coworkers, or the public, but could accept supervision and relate to coworkers if that contact was infrequent.

In 2010, Mr. Aguirre began a period of incarceration and was treated by medical providers at the Colorado Department of Corrections. At an intake examination performed in May 2010, the treating physician, Dr. Miller, listed Mr. Aguirre's past medications as risperdone and sertraline. Mr. Aguirre told Dr. Miller that he had racing thoughts, audio hallucinations, anxiety and nervousness around people, paranoia, sweating, rapid heartbeat and dizziness. Side effects from the medication included muscle cramps, twitching, insomnia, and increased racing thoughts. He denied serious depression or psychotic distress. Dr. Miller found Mr. Aguirre to be alert, attentive, and oriented, but worried. He discontinued Mr. Aguirre's old medication, diagnosed him with PTSD and panic disorder without agoraphobia and prescribed Depakote.

During another examination in July 2010, Mr. Aguirre told Dr. Shulstad, another Department of Corrections treating physician, that he experienced racing thoughts and fears of being near other prisoners. He also stated that his anxiety and depressed mood both increased due to the Depakote. Dr. Shulstad wrote in his treatment record that Mr. Aguirre had an anxious affect but was calm and increased his Depakote prescription. Similarly, in September 2010, Mr. Aguirre told Dr. Jones, a third Department of Corrections treating physician, that he had increasing insomnia and audio hallucinations that involved voices telling him that people wanted to harm him. Dr. Jones concluded that Mr. Aguirre was adjusted, but was depressed, paranoid, and had a constricted affect. Mr. Aguirre was again proscribed Depakote as well as Geodon.

In October 2010, Mr. Aguirre was feeling better and had accepted his paranoia. However, in February 2011, he told Dr. Shulstad that he had stopped taking Geodon because, along with the Depakote, it made him dizzy and angry. Having stopped his medication, Mr. Aguirre stated that he had increased anxiety, social discomfort and feared other people. Based on his observations, Dr. Shulstad wrote that Mr. Aguirre appeared to be calm and cooperative

with normal speech, motor activity and form of thought.  However, he also wrote that Mr. Aguirre had an irritated mood, as well as a constricted and depressive affect.  He diagnosed Mr. Aguirre with bipolar disorder not otherwise specified and restarted him on Depakote, with the prescription gradually increasing from one pill per day to three pills per day.

Unfortunately, a significant portion of the March 2011hearing transcript was inaudible, including at least 32 instances during Mr. Aguirre's testimony.  The following is a germane excerpt beginning at page 32 of the record:

> Q  …What kind of medications were you getting?
> A  Zoloft.
> Q  Was that taking away the depression, anxiety, stress?
> A  No, not [inaudible].  I'm seeing multiple doctors trying to figure out what kinds of dosage and [INAUDIBLE] usually [INAUDIBLE] trying to figure that out.
> ….
> Q  Now, do they prescribe medication for you?
> A  Yes.
> Q  What kind of medications are they prescribing now?
> A  I'm probably going to have down [INAUDIBLE] difficult.
> Q  Is that the only medication?
> A  I was [INAUDIBLE], it was smeared off [phonetic].  But they have – took me off.  It increased my anxiety more.  And [INAUDIBLE] myself.
> Q  How long ago did they change you to the correct medication?
> A  I been on Depakote.  But they took me off of the [INAUDIBLE] about two months ago.

**IV.    Standard of Review**

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance.  *Lax v. Astrue*, 489

6

F.3d 1080, 1084 (10th Cir. 2007). On appeal, a reviewing court's job is neither to "reweigh the evidence nor substitute our judgment for that of the agency." *Branum v. Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). Essential to this Court's review of the Commissioner's decision is a complete record. Pursuant to 42 U.S.C. § 405(g), "[a]s part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."

The ALJ is required to consider the medical opinions in the record, along with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b); § 416.927(b).[4] When evaluating medical opinions, the opinion of a physician or psychologist who has not examined the claimant, including the opinion of a State agency physician or psychologist, is given weight only to the degree it is supported by evidence in the record. Factors considered when evaluating the opinion of a physician or psychologist who has not examined the claimant include:

> 1) the supportability of the opinion in the evidence including any evidence received at the [ALJ] and Appeals Council level that was not before the state agency; 2) the consistency of the opinion with the record as a whole, including other medical opinions; 3) any explanation for the opinion provided by the state agency [physician or psychologist]; 4) whether or not the physician is a specialist in the area upon which an opinion is rendered; and 5) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

96-6p; 20 C.F.R. § 416.927(c).

---

[4] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition. Hereafter, the Court will only cite the pertinent Title XVI regulations governing supplemental security income, found at 20 C.F.R. Part 416. The corresponding regulations governing disability insurance benefits under Title II, which are substantively the same, are found at 20 C.F.R. Part 404.

Having considered these factors, an ALJ must give good reasons in the decision for the weight assigned to a medical opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Luttrell v. Astrue*, 453 Fed.Appx. 786, 794 (10th Cir. 2011) (unpublished). The ALJ is not required to explicitly discuss all the factors outlined in 20 C.F.R. § 416.927. *Oldham*, 509 F.3d at 1258; SSR 06-03p. However, the ALJ must discuss not just evidence that supports the decision, but also "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (citation omitted). The ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation omitted). Similarly, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted).

At Step 4 in the disability analysis, the ALJ is also required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. 20 C.F.R. § 416.945. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. 20 C.F.R. § 416.929(a). Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate. By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. 20 C.F.R. § 416.929(c)(4). If a claimant has a medically determinable impairment that could reasonably be

8

expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. 20 C.F.R. § 416.929(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).[5] The third step of the *Luna* analysis involves a holistic review of the record. ALJ must consider pertinent evidence including a claimant's history, medical signs, and laboratory findings, as well as statements from the claimant, medical or nonmedical sources, or other persons. 20 C.F.R. § 416.929(c)(1). In addition, 20 C.F.R. § 416.929(c)(3) instructs the ALJ to consider:

> 1) [t]he individual's daily activities; 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) [f]actors that precipitate and aggravate the symptoms; 4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is whether and to what degree there are conflicts between the claimant's statements and the rest of the evidence. *Id*. Ultimately, the ALJ must make specific evidentiary findings with regard to the existence, severity, frequency, and effect of the subjective symptoms on the claimant's ability to work. 20 C.F.R. § 416.929(c)(4). This requires specific

---

[5] The ALJ need not follow a rote process of evaluation, but must specify the evidence considered and the weight given to it. *Qualls v. Apfel*, 206 F3d 1368, 1372 (10th Cir. 2000).

evidentiary findings supported by substantial evidence. *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988); *Diaz*, 898 F.2d at 777.

## V.  Discussion

### A. Medical Opinions

Because the Decision gave Dr. Wanstrath's medical opinion "considerable weight", the Court begins with assessment of his opinion.   Dr. Wanstrath, a state agency psychologist, reviewed Mr. Aguirre's records and the opinion of an examining psychologist, Dr. Madsen.  Dr. Wanstrath ultimately opined that Mr. Aguirre could work subject to certain limitations. The Decision characterized this opinion as "consistent with the record as a whole" but not all of the functional limitations in it were incorporated into Mr. Aguirre's RFC.  In particular part, the RFC omits Dr. Wanstrath's finding that Mr. Aguierre was unable to work closely with supervisors, coworkers, or the public, and could accept only infrequent supervision and interaction with co-workers.

Mr. Aguirre argues that a) the ALJ erred by not adopting all of the limitations outlined in Dr. Wanstrath's opinion, despite purportedly giving it "great weight"; and b) the ALJ erred by giving greater weight to Dr. Wanstrath's opinion than Dr. Madsen's opinion.   The Court finds three errors in the assessment of the medical opinons in conjunction with formulation of Mr. Aguirre's RFC.

First, the Decision erroneously states that Dr. Wanstrath's opinion is consistent with the other evidence in the record.  When evaluating any medical opinion, including an opinion from a physician or psychologist who has not examined the claimant, an ALJ must consider several factors, including the degree to which the opinion is supported by other relevant evidence and the consistency between the opinion and the record as a whole.  20 C.F.R. § 416.927(c).  The ALJ

must "evaluate the degree to which [medical opinions] consider all of the pertinent evidence in [a claim]." *Id*.

Dr. Wanstrath's 2009 opinion was premised on a record review at that time. By definition, it did not include Mr. Aguirre's subsequent diagnosis and treatment in 2010 and 2011, which was substantially more comprehensive and well documented. Indeed, Dr. Wanstrath based his opinion on the absence of any mention of mental illness, treatment, medication or other signs of mental impairment in Mr. Aguirre's medical records as of 2009. In contrast, Mr. Aguirre's medical records while he was housed at the Department of Corrections, especially those from May, July, September and October 2010 and February 2011 reflect diagnosis of multiple mental health issues, persistent and varied treatment and significant impairment despite treatment. These records are clearly inconsistent with Dr. Wanstrath's assumptions and tend to refute his opinion. The failure to recognize and discuss the significance of the post-2009 medical records on the 2009 medical opinion was error.

Second, the Decision fails to explain why only part of Dr. Wanstrath's opinion was adopted in formulation of the RFC. An ALJ is not free to "cherry pick" the evidence, relying on evidence that supports the ALJ's findings and ignoring unfavorable evidence. *Clifton*, 79 F.3d at 1010. Similarly, the ALJ cannot pick and choose among portions of medical reports or opinions, choosing only those aspects that support a finding of no disability. *Carpenter*, 537 F.3d at 1265; *Haga*, 482 F.3d at 1208. Assuming that Dr. Wanstrath's opinion was the appropriate starting place for formulation of Mr. Aguirre's RFC, there is no explanation of why his recommended limitation in Mr. Aguirre's ability to work closely with supervisors or coworkers was not included. This omission also warrants reversal and remand.

Finally, the Decision does not provide sufficient explanation for the ALJ's preference for Dr. Wanstrath's opinion as compared to Dr. Madsen's opinion as to Mr. Aguirre's functional limitations. The ALJ was required to weigh both Dr. Madsen's opinion and Dr. Wanstrath's opinion in accordance with the factors found enunciated in 20 C.F.R. 404.1527(c). Generally, the opinion of an agency physician who has never seen the [plaintiff] is entitled is accorded less weight that either a treating physician or an examining physician. See, e.g. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir.2004). The Decision does not reflect consideration of the relevant factors for weighing the opinions, nor why Dr. Wanstrath's opinion was given "significant weight" and Dr. Madsen's opinion given "little weight".

Both doctors were consulting psychologists who prepared reports in 2009. Dr. Madsen reviewed Mr. Aguirre's medical records and examined him. Dr. Wanstrath only reviewed Mr. Aguirre's medical records and Dr. Madsen's report. Dr. Madsen's and Dr. Wanstrath's opinions differed in substantial respect. For example, Dr. Madsen diagnosed Mr. Aguirre as suffering from dysthymia or depression, PTSD, alcohol abuse, impaired intellectual functioning and a developmental learning disability. According to Dr. Madsen, Mr. Aguirre's impairments caused sleep disturbance, decreased energy and motivation, and that as a result Mr. Aguirre had difficulties focusing, concentrating and staying motivated. He found marked impairments in the ability to do work-related activities. Dr. Wanstrath noted that there was no record of a diagnosis or treatment of mental illness in prior treatment records which influenced his opinion that Mr. Aguirre had chronic but moderate symptoms, including isolation, learning problems, and interpersonal conflict, but such symptoms were not severe enough to preclude work.

The only explanation offered for the different weight given to these opinions is that Dr. Wanstrath's opinion was "consistent with the record". Even if this statement was accurate, it

does not reflect consideration of all of the factors required for assessment of each opinion or explain why a non-examining physician's opinion was more persuasive than that rendered by an examining physician. This, too, is an error requiring reversal.

### B. Subjective Symptoms

Mr. Aguirre testified that he experienced various subjectively experienced symptoms - panic attacks, a racing heart, painful flashes of light, fear of people and social interaction, insomnia, paranoia, fatigue, crying spells and difficulty concentrating. Subjective symptoms must be assessed in accordance with SSR 96-7p. As noted earlier, such assessment requires a three step analysis determining: 1) whether there is an objective impairment that might give rise to the subjectively reported symptoms; 2) whether there is a "loose nexus" between the proven impairment and the subjective symptoms: and 3) and finally, considering both the objectively proven impairment and subjectively experienced symptoms, whether an impairment is disabling. Although the analysis need not be articulated in a rigid step-by-step fashion, a decision must reflect consideration of all three components.

Here, the Decision states that Mr. Aguirre's symptoms are not being well-supported by the record. Mr. Aguirre challenges this finding on two grounds: 1) that the ALJ did not properly assess Mr. Aguirre's testimony; and 2) that the record is not sufficient to properly review the ALJ's findings. The Court finds error in both respects.

First, the Court notes that the Decision articulates the correct legal standard for assessment of subjective symptoms. However, it is not clear that the first two steps were completed. For example, the ALJ found that Mr. Aguirre had several severe impairments at Step 2 – dysthymia, post-traumatic stress disorder ("PTSD"), a developmental learning disability, and episodic alcohol abuse. In addition, the medical evidence of record shows

diagnoses of a panic disorder without agoraphobia and a bi-polar disorder. The Decision does not attempt to correlate these objective impairments with Mr. Aguirre's subjective symptoms, either to determine whether the impairments might give rise the symptoms or whether there is a "loose nexus" between them.

In addition, the decision does not address any evidence in the record that supports Mr. Aguirre's statements regarding his subjective symptoms. The decision refers to medical records for rejecting Mr. Aguirre's statements, such as specific treatment notes reflecting that he was calm, cooperative and exhibited normal speech, motor activity and form of thought, but it does not address the bulk of treatment notes in 2010 and 2011 that demonstrate Mr. Aguirre suffered from anxiety, social discomfort and auditory hallucinations (e.g. when Mr. Aguirre stopped taking Geodon because it made him dizzy and caused angry thoughts, Dr. Shulstad re-prescribed Depakote with instructions to increase dosage regularly despite his apparently calm disposition during the exam or treatment notes stating that Mr. Aguirre had an irritated mood, as well as a constricted and depressive affect). These omissions are significant because they suggest that Mr. Aguirre experienced subjective symptoms and the side effects caused by the medication.

Finally, the Court addresses Mr. Aguirre's statements about the quality of the hearing transcript. A significant portion of the transcript is missing, replaced by the word "inaudible." Mr. Aguirre argues that the incomplete transcript warrants reversal and remand, per se. The Commissioner responds that the record sufficiently reflects Mr. Aguirre's testimony regarding his subjective symptoms and treatment.

Pursuant to 42 U.S.C. § 405(g), the Commissioner must provide this Court with a full record for review, including a transcript of any hearing held before an ALJ. In this case, there are at least 32 instances in the transcript in which Mr. Aguirre's testimony was interrupted with

an "inaudible" notation. Although not as frequent, questions from both the ALJ and Mr. Aguirre's attorney were also noted as "inaudible."

The Government cites to *Musgrave v. Sullivan*, 966 F.2d 1371, 1374-75 (10th Cir. 1992), for the proposition that a hearing is sufficient if the ALJ asked enough questions to ascertain (1) the nature of a claimant's impairments, (2) the claimant's treatment and medication, and (3) the impact of the impairment on a claimant's daily routine and activities. However, *Musgrave* is not directly on point, as the issue in that case concerned the brevity of the hearing, rather than an incomplete record of it.

The situation of an incomplete transcript is better addressed in an unpublished decision, *Moore v. Chater*, 85 F.3d 641 (Table) (10th Cir. 1996). There, the 10th Circuit found that "the existence of several inaudible gaps" did not make the ALJ's decision unreviewable because substantial evidence existed in the record to support the ALJ's decision. *Moore* demonstrates that not all deficiencies in a record prevent a court from providing meaningful review. The question is whether the record is sufficiently complete such that the court can both follow the ALJ's reasoning and determine whether factual findings are supported by substantial evidence.

Having reviewed the transcript, the Court finds that the numerous inaudible portions impair its ability to adequately review the ALJ's decision. For example, as noted above, the ALJ did not consider the portion of a February 2011 medical record that addressed Mr. Aguirre's medications and side effects. The transcript suggests that in several instances Mr. Aguirre's described his treatment and side effects, but many segments of the testimony were omitted as inaudible. (e.g. when Mr. Aguirre was asked whether Zoloft eliminated his depression, anxiety and stress (AR at 32). The details of this missing testimony are relevant to the ALJ's assessment

of Mr. Aguirre's statements about his symptoms. Their absence significantly affects the Court's ability to review the ALJ's decision.

Finding reversible error at Step 4, the Commissioner of Social Security's decision is **REVERSED**, and the case is **REMANDED.** The Clerk shall enter a Judgment in accordance herewith.

DATED this 12th day of September, 2013

                                          **BY THE COURT:**

                                          Marcia S. Krieger
                                          United States District Judge